## UNITED STATES BANKRUPTCY COURT FOR THE
## NORTHERN DISTRICT OF IOWA

IN RE:         )
            )  **Chapter 12**
**GARY L. SCHLEY AND**   )
**JULIE M. SCHLEY,**    )
            )  **Bankruptcy No. 10-03252**
   **DEBTORS.**    )

            )
**GARY L. SCHLEY AND**   )
**JULIE M. SCHLEY,**    )
            )
   **PLAINTIFFS,**    )  **Adversary No. 10-09255**
            )
**v.**           )
            )
**PEOPLES BANK,**     )
**WATONWAN FARM SERVICE, AND** )
**COOPERATIVE CREDIT COMPANY** )
            )
   **DEFENDANTS.**   )
            )
**PEOPLES BANK,**     )
            )
   **CROSS-CLAIMANT,**  )
            )
**v.**           )
            )
**WATONWAN FARM SERVICE,**  )
            )
   **DEFENDANT TO**   )
   **CROSS-CLAIM,**   )
            )
**COOPERATIVE CREDIT COMPANY,** )
            )
   **CROSS-CLAIMANT,**  )
            )
**v.**           )
            )

PEOPLES BANK,                          )
                                       )
        DEFENDANT TO                   )
        CROSS-CLAIM,                   )
                                       )
PEOPLES BANK,                          )
                                       )
        CROSS-CLAIMANT,                )
                                       )
v.                                     )
                                       )
COOPERATIVE CREDIT COMPANY,            )
                                       )
        DEFENDANT TO                   )
        CROSS-CLAIM.                   )
_____

## RULING ON PEOPLES BANK'S, COOPERATIVE CREDIT COMPANY'S, AND WATONWAN FARM SERVICE'S CROSS MOTIONS FOR PARTIAL SUMMARY JUDGMENT

These matters came before the Court on Peoples Bank's Motion for Partial Summary Judgment, Cooperative Credit Company's Motion for Partial Summary Judgment, and Watonwan Farm Service's Motion for Partial Summary Judgment. The Court held a telephonic hearing. Aimee Lowe appeared on behalf of Peoples Bank. Peter Leo appeared on behalf of Cooperative Credit Company. Keith Duffy appeared on behalf of Watonwan Farm Service. The Court took these matters under advisement. These are core proceedings under 28 U.S.C. § 157(b)(2)(K).

## STATEMENT OF THE CASE

Debtors filed this adversary to determine the priority of liens held by Peoples Bank (the "Bank"), Cooperative Credit Company ("CCC"), and

2

Watonwan Farm Service ("WFS").  All three parties claim a first priority lien in Debtors' livestock proceeds, which total $209,412.24 and are currently being held in escrow.

This case, like another case currently pending before this Court, addresses the continuing applicability or the extent of the reach of this Court's decision in In re Shulista, 451 B.R. 867 (Bankr. N.D. Iowa 2011) following the Iowa Supreme Court's decision in Oyens Feed & Supply, Inc. v. Primebank, 808 N.W.2d 186 (Iowa 2011).  WFS argues that this Court's decision in Shulista should no longer apply.  The Bank and CCC support the continuing validity and analysis from Shulista.  After reviewing this case, and the other pending case challenging Shulista, the Court concludes that particular issue provides only a small part of the analysis needed to decide this case.  For the separate reasons stated below, the Court grants, in part, and denies, in part, all Motions for Partial Summary Judgment.

## BACKGROUND

Debtors Gary L. Schley and Julie L. Schley (collectively "Debtors") run a "feeder to finish" pig operation.  Their operation consists of two farm sites situated 15 miles apart.  The "Lone Rock" site has the capacity to hold 3,000 pigs and the "Titonka" site has the capacity to hold 2,400 pigs.

### A.    Security Agreements with CCC

On September 29, 2004 and October 8, 2004, Debtors executed two security agreements in favor of CCC.  The security agreements secured "all obligations, debts, and liabilities" incurred by Debtors "whether now existing or hereinafter arising."  The two security agreements list the secured collateral as Debtors' "Inventory, Chattel Paper, Accounts, Equipment, General Intangibles, Farm Products, Livestock (including all increase and supplies) and Farm Equipment." Both security agreements included an after-acquired property clause.  On October 1, 2004, CCC filed a financing statement covering the same collateral listed in the security agreements.  On October 8, 2008, Debtors issued CCC a promissory note for $402,000.  On September 8, 2009, CCC filed a continuation statement for the financing statement.

### B.    Security Agreements with the Bank

More than four years after executing the security agreements with CCC, on October 20, 2008, March 23, 2009, August 21, 2009, and September 23, 2009, Debtors executed four promissory notes in favor of the Bank for $388,000, $60,000, $760,000, and $152,000, respectively.  These notes total $1,360,000.  The four notes were each secured with security agreements dated July 3, 2008, October 17, 2008, December 30, 2008, and March 23, 2009, respectively.  The security agreements granted the Bank a security interest in Debtors' livestock and proceeds.

4

The Bank filed a financing statement with the Iowa Secretary of State on October 27, 2008.

In November and December 2009, Debtors purchased 3,061 pigs for $91,957.37. It is unclear whether these pigs were housed at the Lone Rock site, the Titonka site, or both. It is also unclear whether Debtors had pigs from other purchases. In 2010, while Debtors raised the pigs, Debtors purchased feed from two suppliers—Crystal Valley Cooperative and WFS. It is unclear what feed went to what site and fed what pigs.

### C.    Security Agreements With WFS

Between February 9, 2010 and March 11, 2010, WFS supplied Debtors with feed totaling $43,314.54. On February 26, 2010, Debtors executed a security agreement with WFS. The security agreement granted WFS an interest in Debtors' "farm products, crops, receivables, inventory, and all proceeds and products therefrom which are now owned and hereafter acquired." On March 11, 2010, WFS filed a financing statement with the Iowa Secretary of State. This financing statement repeated the collateral description from the February 26, 2010 security agreement. The financing statement also marked the box indicating that it was an "Ag Lien." Between March 12, 2010 and June 2, 2010, WFS supplied Debtors with feed totaling an additional $93,058.03. The total of the feed WFS supplied between February 9, 2010, and June 2, 2010 was $136,373.57.

5

### D.      Payments to WFS and Sale of the Pigs

On March 16, 2010, the Bank paid WFS $50,000 on Debtors' account in order to keep WFS supplying feed for the pigs.  The Bank also paid WFS $60,000 on May 21, 2010, $3,975 on June 4, 2010, and $3,883.24 on June 10, 2010.  All of those payments were on Debtors' account with WFS.  The Bank's payments to WFS total $117,858.24.

Between June 1, 2010 and June 28, 2010, Debtors sold 1,490 of the 3,061 pigs to Premier Pork Marketing, Inc. ("Premier Pork").  Premier Pork paid for the pigs with nine checks made out jointly to Debtors, the Bank, and WFS.  The checks total $209,412.24 and were deposited into an escrow account.

### E.      Second Financing Statement of WFS

On June 30, 2010, WFS filed a second financing statement with the Iowa Secretary of State.  The financing statement describes the collateral secured as all of Debtors' "crops and livestock which are now owned or hereafter acquired and all proceeds and products therefrom."  The financing statement identifies itself as "filed to perfect an Agricultural Supply Dealer's Lien pursuant to Iowa Code Chapter 570A."

### F.      Bankruptcy Filing and Motions Before the Court

Debtors filed a Chapter 12 bankruptcy petition on December 3, 2010.  On December 17, 2010, Debtors filed this adversary action, asking the Court the

6

priority of the three parties claiming liens or security interests in the $209,412.24

of sale proceeds. The Bank filed a Motion for Partial Summary Judgment on

December 3, 2012. The Bank asserts that its interest in the proceeds takes priority

over WFS's interest. The Bank does not seek summary judgment on the question

of its priority against CCC. CCC joined the Bank's Motion for Partial Summary

Judgment and also filed its own Motion for Partial Summary Judgment on

December 19, 2012. CCC asserts that its interest in the proceeds also takes priority

over WFS's interest. WFS also filed a Motion for Partial Summary Judgment on

January 9, 2013. WFS asserts that its interest in the proceeds has superpriority

over the Bank and CCC as an agricultural supply lien under Iowa Code § 570A.5.

It believes it has a superpriority lien for all of the feed it supplied from February 9,

2010 to June 2, 2010.

## CONCLUSIONS OF LAW AND DISCUSSION

### A.   <u>Summary Judgment Standard</u>

Summary judgment is governed by Federal Rule of Bankruptcy Procedure

7056. Rule 7056 applies Federal Rule of Civil Procedure 56 in adversary

proceedings. Fed. R. Bankr. P. 7056. Rule 56 states, in relevant part, that: "The

court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). Granting "[s]ummary judgment is proper if, after

viewing the evidence and drawing all reasonable inferences in the light most

favorable to the nonmovant, no genuine issues of material fact exist and the

movant is entitled to judgment as a matter of law." Hayek v. City of St. Paul, 488

F.3d 1049, 1054 (8th Cir. 2007).  Summary judgment is appropriate when only

questions of law are involved.  Anderson v. Hess Co., 649 F.3d 891, 894 (8th Cir.

2011).

The burden of showing there are no genuine issues of material fact belongs

to the moving party.  Winthrop Res. Corp. v. Eaton Hydraulics, Inc., 361 F.3d 465,

468 (8th Cir. 2004).  "Once the movant has supported the motion, the non-moving

party 'must affirmatively show that a material issue of fact remains in dispute and

may not simply rest on the hope of discrediting the movant's evidence at trial.'"  In

re Houston, 385 B.R. 268, 271 (Bankr. N.D. Iowa 2008) (quoting Barge v.

Anheuser-Busch, Inc., 87 F.3d 256, 260 (8th Cir. 1996)).

"A 'material' fact is one 'that might affect the outcome of the suit under the

governing law . . . .'"  Johnson v. Crooks, 326 F.3d 995, 1005 (8th Cir. 2003)

(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  An issue of

material fact is genuine if a reasonable fact-finder could return a verdict for the

nonmoving party on the question.  Anderson, 477 U.S. at 252.  Evidence that raises

only "some metaphysical doubt as to the material facts" does not create a genuine

issue of fact.  Matsushita Elec. Indus. Co. v. Zenith Radio, Corp., 475 U.S. 573,

586 (1986). "'Where the record taken as a whole could not lead a rational trier of

fact to find for the nonmoving party, there is no genuine issue for trial.'" In re

Patch, 526 F.3d 1176, 1180 (8th Cir. 2008) (quoting Matsushita Elec. Indus. Co.,

475 U.S. at 587).

**B.    There Are Genuine Issues of Material Fact As To Whether WFS Has an Agricultural Supply Dealer Lien in the Livestock Debtors Sold**

WFS argues that it is entitled to summary judgment because it has

superpriority under the Iowa Agricultural Supply Dealer statute—Iowa Code

§ 570A.3.  That statute states in relevant part:

> **An agricultural supply dealer who provides an agricultural supply to a farmer shall have an agricultural lien** as provided in section 554.9102. The agricultural supply dealer is a secured party and the farmer is a debtor for purposes of chapter 554, article 9. The amount of the lien shall be the amount owed to the agricultural supply dealer for the retail cost of the agricultural supply, including labor provided. **The lien applies to all of the following:**
> . . .
> 2. **Livestock consuming the feed**. However, the lien does not apply to that portion of the livestock of a farmer who has paid all amounts due from the farmer for the retail cost, including labor, of the feed.

Iowa Code § 570A.3(2) (emphasis added).

WFS argues that it is undisputed that it provided feed to Debtors, that

Debtors fed their pigs with WFS feed, and the statute provides WFS with a lien on

the pigs for the retail cost of all the feed supplied.  WFS asserts it has an

agricultural lien under the express terms of the statute, and thus a superpriority lien

on the sale proceeds.

The Bank and CCC assert that WFS does not have an agricultural lien in the

escrowed sale proceeds for three reasons: 1) WFS has not proven that the portion

of the livestock Debtors sold to Premier Pork consumed the feed WFS supplied; 2)

WFS has been paid by the Bank for all the feed to which its lien could apply—

$39,067.08 of feed from the 31-day period preceding the March 11, 2010 financing

statement and $7,648.08 of feed sold within 31 days prior to filing the June 30,

2010 financing statement, for a total amount of $46,715.16; and 3) even if it could

prove issues (1) and (2), agricultural liens do not apply to proceeds.  WFS strongly

disagrees and argues that it has a valid agricultural lien in the escrowed funds.

WFS argues that 1) the livestock Debtor sold to Premier Pork did consume the feed

WFS supplied; 2) WFS has not been paid for the feed it supplied, which totals

$136,372.57; and 3) agricultural liens do apply to proceeds.   The Court finds there

are genuine issues of material fact on issues (1) and (2)—whether the livestock

Debtors sold consumed the feed WFS supplied and whether WFS has been paid for

the feed that it supplied.  Thus, those issues do not provide a basis for summary

judgment.

WFS provided invoices showing that it provided feed to Debtors from

February 9, 2010 to June 2, 2010.  However, Debtors have two operation sites, two

10

feed suppliers, and only sold 1,490 out of 3,061 of their livestock.  Section 570A.3

grants an agricultural lien in "livestock **consuming** the feed."  Id. (emphasis

added).  Since it is unclear whether Debtors fed WFS feed to the 1,490 pigs

Debtors sold, there is a genuine dispute of material fact whether WFS has an

agricultural lien.

Section 570A.3 specifically states that "the lien does not apply to that

portion of the livestock of a farmer who has paid all amounts due."  Id.  WFS has

shown invoices for feed provided from February 9, 2010 to June 2, 2010 and

claims that it has not been paid for these invoices.  However, the Bank has also

shown that it made payments to WFS on Debtors' behalf on March 16, 2010, May

21, 2010, June 4, 2010, and June 10, 2010, which total $117,858.24.  The Bank

argues that WFS only has a valid agricultural lien for the $46,715.16 of feed sold

during the 31-day period preceding the March 11, 2010 and June 30, 2010

financing statements.  The Bank thus claims WFS has been paid in full on its

agricultural supply lien.

It is unclear from the existing record whether the Bank's payments to WFS

were for the feed invoices at issue or for Debtors' outstanding balance from prior

dates.  At a minimum, the record is unclear and disputed about what invoices were

paid by what payments and what amounts—if any—remain unpaid.  Therefore,

there is a genuine dispute of material fact about whether WFS has been paid in full,

which would prevent an agricultural lien.  Summary judgment is not available on

issues (1) and (2).  The Court now turns to the third issue—whether Iowa

agricultural liens apply to proceeds from a livestock sale.

### C.    Does the Iowa Agricultural Supply Dealer Lien Statute—as Written—Provide That Agricultural Liens Continue in Proceeds?

The critical question for this Court is whether WFS's potential agricultural

supply lien could extend to the sale proceeds.  As a preliminary matter, this Court

notes that under In re Shulista, 451 B.R. 867 (Bankr. N.D. Iowa 2011) and this

Court's decision in In re Big Sky Farms, Inc., No. 12-01711, Adv. No. 13-09038

(Bankr. N.D. Iowa April 18, 2014), filed simultaneously herewith, any

superpriority lien WFS has (even after resolving the fact issues noted above) would

be limited under § 570A.4(2) to the 31 days before it filed a financing statement.

On the record made in this case to date, the first financing statement would—at

most—cover $43,317 in feed WFS claimed it supplied to Debtor.  The second

financing statement, filed after the sale of the pigs at issue here, would cover the

31-day period before June 30, 2010.  The amount for that period is unclear.  The

total amount of feed supplied during the 31 days prior to the first and second

filings would be the maximum amount WFS could recover.

The next question becomes whether that amount can be recovered from the

proceeds of a pre-bankruptcy petition sale, or whether an agricultural supply lien is

limited to a lien only on the collateral—the livestock consuming the feed.  Section

12

570A.3, which governs the creation of an agricultural lien, specifically states that the lien is created in the "livestock consuming the feed." Iowa Code § 570A.3(2). As noted, Debtors sold the portion of its livestock at issue in this case between June 1, 2010 and June 28, 2010, before filing for bankruptcy. The proceeds from the sale are held in an escrow account. The question is whether the agricultural supply dealer lien extends to proceeds of the sale of the collateral (the pigs). The Bank and CCC argue the agricultural supply dealer lien does not extend to proceeds. Thus, they argue WFS has no claim to any of the money because it is all proceeds. WFS argues that the lien statute applies and extends its status as a secured party to the proceeds, and any other reading would make the agricultural supply dealer lien virtually meaningless in terms of protection for suppliers.

The Court begins the analysis by noting that three cases have interpreted other aspects of the Iowa Agricultural Supply Dealer Lien Statute: In re Crooked Creek Corp., 427 B.R. 500 (Bankr. N.D. Iowa 2010) overruled on other grounds by Oyens Feed & Supply, Inc. v. Primebank, 808 N.W.2d 186; In re Coastal Plains Pork, LLC, 438 B.R. 845 (Bankr. E.D.N.C. 2010); and In re Shulista, 451 B.R. 867 (Bankr. N.D. Iowa 2011). In each of these three cases, the court addressed an assertion of the agricultural lien superpriority against the debtor's main financer. In all three cases, the livestock had been sold and the court was determining whether the suppliers had agricultural liens on the proceeds. However, none of the

13

parties in those cases raised the issue of whether an agricultural lien continues in

proceeds.  Moreover, the factual record in each of those cases differed in very

important respects.  In each of those cases, the livestock were sold 1) post-petition,

2) after receiving a court order, and 3) with explicit language in the court order

directing that the lienholders interests continued in the proceeds with the same

priority as in the livestock.  See Coastal Plains Pork, 438 B.R. at 846 ("After the

filing of the petition, and in compliance with other orders of this Court, the hogs

that consumed feed from FCS and CEA were to be sold, and any liens, claims or

other interests in the hogs would attach to the proceeds of the sale."); Crooked

Creek, 427 B.R. at 502–03 ("[P]ursuant to order of this court, the disputed

livestock was sold . . . . In accordance with a court-approved agreement . . . the

creditors' respective lien claims attached to the disputed livestock proceeds in the

same nature and priority as their liens had attached to the disputed livestock.")

overruled on other grounds by Oyens Feed, 808 N.W.2d at186; In re Shulista, 451

B.R. at 870 ("The Court authorized [debtors to] sell 5,002 head of feeder pigs.  The

Order stated that 'the liens of all parties claiming an interest in pigs . . . shall attach

to the proceeds in the same manner and fashion as if the [P]igs had not been sold

and with the same priority as if the [P]igs had not been sold.'").

        In this case, Debtors sold the livestock before bankruptcy, without an order

from the court, and without any agreement continuing any potential lien WFS had

in the livestock to the proceeds.  Therefore, unlike the agricultural lienholders in

<u>Oyens Feed</u>, <u>Coastal Plains</u>, and <u>Shulista</u>, there is no court order that carries all

existing liens into the proceeds and thus no ruling by those courts that the statutory

lien carries into proceeds absent a court order.  Thus, this Court must address this

question as a matter of first impression.

> 1.   <u>The Agricultural Supply Dealer Lien Statute Does Not</u>
> <u>Specifically Address the Issue</u>

Iowa Code § 570A—the Agricultural Supply Dealer Lien statute—does not

provide a readily available answer to the question before this Court.  In fact, the

statute is silent on whether agricultural liens extend to proceeds.  Section 570A.3,

provides only for an **agricultural lien** and that the lien **makes the dealer a**

"**secured party** . . . for the purposes of Chapter 554, Article 9."  Iowa Code

§ 570A.3 (emphasis added).  The Court must thus interpret the applicable portions

of Chapter 554, Article 9—the Iowa UCC—to determine this issue.

> a.   <u>Arguments of the Bank and CCC</u>

The Bank and CCC argue that the reference in § 570A to Chapter 554, Article

9 provides a clear answer.  They first argue that Iowa Code § 554.9315 specifically

addresses whether an interest attaches to proceeds.  The Bank and CCC argue Iowa

Code § 554.9315 only allows a **security interest** to attach to proceeds—not an

**agricultural lien**.  That statute states:

1. Disposition of collateral--**continuation of security interest or agricultural lien--proceeds**. Except as otherwise provided in this Article and in section 554.2403, subsection 2:

a. **a security interest or agricultural lien continues in collateral** notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest or agricultural lien; and

b. **a security interest attaches to any identifiable proceeds** of collateral.

Id. § 554.9315 (emphasis added).

The Bank and CCC first point out that §554.9315(1)(b) allows only a security interest, not an agricultural lien, to attach to proceeds. The Bank and CCC further point out that "security interest" and "agricultural lien" are defined and treated separately in that section and others in the Iowa UCC. A security interest is defined as:

an interest in personal property or fixtures which secures payment or performance of an obligation. "Security interest" includes any interest of a consignor and a buyer of accounts, chattel paper, a payment intangible, or a promissory note in a transaction that is subject to Article 9. "Security interest" does not include the special property interest of a buyer of goods on identification of those goods to a contract for sale under section 554.2401, but a buyer may also acquire a "security interest" by complying with Article 9. Except as otherwise provided in section 554.2505, the right of a seller or lessor of goods under Article 2 or 13 to retain or acquire possession of the goods is not a "security interest", but a seller or lessor may also acquire a "security interest" by complying with Article 9. The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer under section 554.2401 is limited in effect to a reservation of a "security interest". Whether a transaction in the form of a lease creates a "security interest" is determined pursuant to section 554.1203.

Id. § 554.1201(2)(ai).  An agricultural lien is defined as:

**an interest, other than a security interest, in farm products:**
> (1) which secures payment or performance of an obligation for:
>> (a) goods or services furnished in connection with a debtor's farming operation; or
>> (b) rent on real property leased by a debtor in connection with its farming operation;
> (2) which is created by statute in favor of a person that:
>> (a) in the ordinary course of its business furnished goods or services to a debtor in connection with a debtor's farming operation; or
>> (b) leased real property to a debtor in connection with the debtor's farming operation; and
> (3) whose effectiveness does not depend on the person's possession of the personal property.

Id. § 554.9102(e) (emphasis added).

The Bank and CCC thus argue that the Iowa UCC provides two important concepts to support their position.  First, they believe that the Legislature intended to treat agricultural liens—like the one at issue here—differently than security interests.  Second, they believe the applicable Iowa UCC provision—Iowa Code § 554.9315—specifically demonstrates that only security interests, not agricultural liens, follow into proceeds. They believe the omission of agricultural liens from § 554.9315(1)(b)—which addresses proceeds—demonstrates the Legislature's intent by omission.

b.    Arguments of WFS

WFS argues the sections of the statute the Bank and CCC cite do not mean what these two creditors argue.  Instead, WFS argues those provisions must be read

17

in context.  WFS notes that before 2000, the Iowa UCC (Chapter 554) did not define an agricultural lien separately from a security interest and allowed security interests to attach to proceeds.  WFS asserts that when the Legislature added a separate definition of agricultural liens, it accidently omitted a parallel change providing that agricultural liens also attach to proceeds.  In the alternative, WFS argues that the Legislature simply assumed that liens, by their nature, would attach to proceeds, but felt it necessary to specify that a security interest would also get that protection.  WFS argues that the reading the Bank and CCC propose would make an agricultural supply lien worthless, because in reality, suppliers do not get paid until the agricultural product is sold.

The Bank and CCC counter WFS's assertion by arguing that an agricultural supplier could take possession of the livestock through judicial process just as any other secured lender would have the right to do in the case of default.  WFS argues that such a result would lead to earlier repossession attempts to the detriment of the pig farmers and the industry as a whole.  WFS points out this is directly contrary to the purpose of the agricultural supply dealer lien, which Oyens Feed specifically noted was to encourage suppliers to work with troubled farmers and provide a fluid feed market.  See Oyens Feed, 808 N.W.2d at 194.

2.   Interpreting the Relevant Statutory Language

"[T]he Supreme Court of Iowa has ultimate autonomy in interpreting the laws

of [the State of Iowa], and we are bound by its interpretation." In re HighSide

Pork, L.L.C., 450 B.R. 173, 178 (Bankr. N.D. Iowa 2011) (quoting Wyldes v.

Hundley, 69 F.3d 247, 253 (8th Cir. 1995)). The Iowa Supreme Court has

summarized the applicable standards for statutory interpretation:

> We will not ordinarily resort to rules of statutory construction
> when the language of a statute is so clear and free from obscurity that
> its meaning is evident from a mere reading. . . . A statute is ambiguous
> if reasonable minds could differ or be uncertain as to the meaning of
> the statute.  Ambiguity may arise in two ways: (1) from the meaning
> of particular words; or (2) from the general scope and meaning of a
> statute when all its provisions are examined. Our ultimate goal in
> interpreting statutes is to determine and give effect to legislative
> intent. When a statute is ambiguous, in order to ascertain the
> legislature's intent, we look to the spirit of the statute as well as the
> words and give a sensible, workable, practical, and logical
> construction. In order to arrive at a reasonable construction which will
> best affect rather than defeat the legislative purpose, we consider the
> following: (1) the language of the statute; (2) the objects sought to be
> accomplished; and (3) the evils sought to be remedied. We may
> consider an ambiguous statute's legislative history and the applicable
> preamble or statement of policy.

Holiday Inns Franchising, Inc. v. Branstad, 537 N.W.2d 724, 728 (Iowa 1995)

(internal citations and quotations omitted).  In Oyens Feed, the Iowa Supreme

Court provided some background on the Legislature's purpose in enacting the

agricultural supply dealer lien statute.  808 N.W.2d at 188–89.  The Iowa Supreme

Court recognized that the statute was created in response to the farm crisis in the

1980s and helped encourage suppliers to sell feed on credit to farmers whose assets were otherwise encumbered by allowing them superpriority.  Id. at 188.  Further, the Iowa Supreme Court found that the "legislature presumably sought to encourage a fluid feed market."  Id. at 194.

As the Bank and CCC point out, "legislative intent is expressed by omission as well as by inclusion of statutory terms."  Id. at 193 (quoting Freedom Fin. Bank v. Estate of Boesen, 805 N.W.2d 802, 812 (Iowa 2011)); accord Chesnut v. Montgomery, 307 F.3d 698, 701–02 (8th Cir. 2002) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quoting Russello v. United States, 464 U.S. 16, 23 (1983)).  Applying these rules of statutory interpretation proves difficult here.  They appear to be at odds with each other.  On the one hand, if the Iowa Legislature had intended for agricultural liens to attach to proceeds, it would have specifically allowed for it, as it did with security interests.  On the other hand, this interpretation may well be at odds with the "object sought to be accomplished" and the "evils sought to be remedied" in the statute.  Holiday Inns, 537 N.W.2d at 728.

The Bank and CCC are correct in noting that the current version of the applicable Iowa Code language departs from prior practice.  The Iowa UCC

previously did not distinguish between a "security interest" and an "agricultural lien."  <u>Compare</u> Iowa Code § 554.9105 (1999) (lacking a definition of, or reference to an "agricultural lien"); <u>with</u> Iowa Code § 554.9102(1)(e) (2013) (defining "agricultural lien").  In the 2000 revisions, however, the Legislature added a separate definition for an "agricultural lien," differentiating it from a "security interest."  <u>See</u> 2000 Iowa Acts Ch. 1149, § 2.  The amendments also put in the exact language the Bank and CCC rely upon here.  As the Iowa Supreme Court has noted, § 554.9315 replaced § 554.9306 that previously addressed proceeds. <u>Peoples Trust & Sav. Bank v. Sec. Sav. Bank</u>, 815 N.W.2d 744, 761 (Iowa 2012). That case specifically noted: "The new provision clearly separates a security interest in the *collateral*, which is addressed under subsection (a), from a security interest in *identifiable proceeds*, which is addressed by subsection (b)."  <u>Id.</u>

The Bank and CCC argue, quite persuasively, that Legislative intent can be shown from omission.  <u>See</u> <u>Oyens Feed</u>, 808 N.W.2d at 193 ("[L]egislative intent is expressed by omission as well as by inclusion of statutory terms.").  The Bank and CCC assert the language of § 554.9315(1)(b) allows security interests to attach to proceeds, but omits reference to agricultural liens.  Directly above that, in § 554.9315(1)(a), they note the legislature included both agricultural liens and security interests for the purpose of continuation in collateral.  The Court agrees this provides some indication that the legislature purposely treated the two sections

21

differently.  See Chesnut, 307 F.3d at 701–02 ("[W]here Congress includes

particular language in one section of a statute but omits it in another section of the

same Act, it is generally presumed that Congress acts intentionally and purposely

in the disparate inclusion or exclusion.").  This would be the classic case of

expressing intention by omission.

However, the Court also notes that WFS's argument that this plain language

reading does not make sense and is contrary to the settled purpose of enacting the

statute has similar appeal and merit.  "Normally we do not interpret statutes so they

contain surplusage." Thomas v. Gavin, 838 N.W.2d 518, 524 (Iowa 2013).

Additionally, "[w]e look for a reasonable interpretation that best achieves the

statute's purpose and avoids absurd results."   State v. Gonzalez, 718 N.W.2d 304,

308 (Iowa 2006) (quoting Harden v. State, 434 N.W.2d 881, 884 (Iowa 1989)).

Oyens Feed addressed the statute's purpose: "The commentators suggest the

legislature intended the lien to encourage the credit sale of agricultural supplies by

providing the supplier a secured lien in the farmers' crops or livestock." Oyens

Feed, 808 N.W.2d at 189.  However, Oyens Feed also noted that the statute is a

"compromise between the interests of agricultural supply dealers and financial

institutions." Id.  The Court is aware that "the absurd results doctrine should be

used sparingly because it entails the risk that the judiciary will displace legislative

policy on the basis of speculation that the legislature could not have meant what it

unmistakably said." <u>The Sherwin-Williams Co. v. Iowa Dep't of Revenue</u>, 789

N.W.2d 417, 427 (Iowa 2010) (quoting Sutherland Statutory Construction § 45:12,

at 105–07).

The Court ultimately agrees with WFS.  Giving an agricultural supply dealer

a lien that can only be enforced against the collateral (in this case, the pigs) but not

the proceeds of that collateral could lead in many circumstances—like this one—to

provide little protection for the agricultural supplier.  Such a reading certainly

would encourage agricultural suppliers to engage in some behaviors that are

contrary to the purposes of the statute noted in <u>Oyens Feed</u>.  It would leave those

suppliers with little or no practical protection and would discourage—rather than

encourage—them from working with troubled farmers.  Even if they decided to

work with troubled farmers, their incentive would be to race to the courthouse for

repossession before the collateral is sold and reduced to proceeds.  This is directly

at odds with the purposes of the statute clearly articulated by <u>Oyens Feed</u>.

Looking into the Iowa UCC revisions, which were an adoption of the

uniform law, makes the position more clear.  Comment 9 to § 554.9315 states:

"This Article **does not determine** whether a lien extends to proceeds of farm

products encumbered by an agricultural lien." <u>Id.</u> § 554.9315 cmt. 9 (emphasis

added).  If the plain language of the statute was in fact meant to determine this

issue, this comment would not only be unnecessary, it would directly contradict the statute.

The Iowa Supreme Court's discussion in Peoples Trust & Sav. Bank v. Sec. Sav. Bank, 815 N.W.2d 744 (Iowa 2012) of the purpose of the new section helps further clarify the issue. The main issue in Peoples Trust was whether a secured lender waived its right in proceeds from a sale of cattle when the lender acquiesced in the borrower's act of selling some of the cattle. Id. at 758–59. Another secured party argued that the main lender's course of conduct in acquiescing in—or not objecting to—the sale acted as a waiver of all its rights in both the collateral and the proceeds. Id. It pointed to previous Iowa cases stating: "'[W]here a secured party waives its security interest in collateral under the course of dealing waiver doctrine, the derivative security interest in proceeds of the collateral should be deemed waived to the same extent.'" Id. at 759 (quoting C & H Farm Service Co. of Iowa v. Farmers Sav. Bank, 449 N.W.2d 866, 875 (Iowa 1989)). The Supreme Court noted this statement was dicta and was inconsistent with an Iowa Court of Appeals case that was not cited or discussed. Id. at 761.

The Iowa Supreme Court noted that after these decisions, the Legislature adopted § 554.9315—the provision the Bank and CCC reply upon here. Id. The Iowa Supreme Court held: "The clear import of the legislative action is that waiver of rights in collateral does not necessarily mean wavier of the rights in the

24

proceeds." Id.  The Court then reviewed the issue again and concluded the better

rule is that a secured party retains rights in proceeds unless the party actually and

knowingly waives that right to proceeds.  Id. at 762.

All of this demonstrates that § 554.9315 intended to fix a problem in prior

case law relating to waivers by conduct.  There is no indication at all that the

section intended to arbitrarily limit an agricultural lien to collateral, but not its

proceeds.  Again, the comments from the UCC specifically state that there was no

such intent in that language.  Comment 9 to § 554.9315 specifically states: "This

Article **does not determine** whether a lien extends to proceeds of farm products

encumbered by an agricultural lien." (Emphasis added).

In reaching this conclusion, the Court rejects the reasoning of Stockman

Bank of Montana v. Mon-Kota, Inc., 180 P.3d 1125, 1134 (Mont. 2008).[1]  The

_____

[1]  The Supreme Court of Montana, interpreting a similar provision of its
Uniform Commercial Code,[1] and finding that agricultural liens do not attach to
proceeds.

> [W]hen the UCC drafters desired to apply a particular provision to
> both agricultural liens and to security interests, the drafters expressly
> referred to both. . . . [Section 30-9A-315(1)(b), MCA and Comment 9
> and Section 30-9A-302, MCA and Comment 2] illustrate that Revised
> Article 9 leaves to other law, namely, the statute under which an
> agricultural lien is created, to determine whether an agricultural lien
> extends to proceeds. In this case, § 71–3–901, MCA, does *not* extend
> to an agricultural supplier the right to a lien on the proceeds from the
> sale of liened farm products. While the statute provides for a lien upon
> "all grains or crops dusted or sprayed," it does not expressly grant

Court finds that the Montana court's conclusion in <u>Stockman</u> is at odds with the

Iowa Supreme Court's decision in <u>Oyens Feed</u>, which stated that the purpose of the

statute was to encourage suppliers to work with troubled farmers and create a fluid

feed market.  Since an agricultural lien that does not continue in proceeds would

discourage—rather than encourage—suppliers from working with trouble farmers,

the Court respectfully disagrees with the Montana Supreme Court's conclusion.

This Court's conclusion is consistent with that of the District Court of the

Fifth Judicial District of Minnesota, which also interpreted this Iowa Statute to

extend to proceeds.  <u>United Prairie Bank v. Galva Holstein AG, LLC</u>, No. 52-CV-

10-356, (Minn. Dist. Ct. May 27, 2011) (order regarding motions for summary

judgment).  In <u>Galva Holstein</u>, the Minnesota District Court noted that Iowa Code

§ 554.9315 did not expressly provide that an agricultural lien extends to proceeds.

<u>Id.</u>  However, the Minnesota District Court concluded that Iowa Code Chapter

570A envisioned, if not implicitly recognized, that agricultural liens would attach

to proceeds because Iowa Code § 570A.5, which addresses the amount of the lien,

---

Capital Harvest a lien on the proceeds from sale of those grains or
crops.

<u>Stockman Bank of Montana v. Mon-Kota, Inc.</u>, 180 P.3d 1125, 1134 (Mont. 2008)
(internal citations omitted) (MCA 30-9A-315 and Comment 9 are identical to Iowa
Code § 554.9315 and Comment 9).

26

relies on the sale price to determine the amount of the lien.  Id.  Iowa Code

§ 570A.5(3), in particular, states:

> A lien in livestock feed shall have priority over an earlier
> perfected lien or security interest to the extent of the difference
> between the acquisition price of the livestock and the fair market
> value of the livestock at the time the lien attaches or the **sale price** of
> the livestock, whichever is greater.

Iowa Code § 570A.5(3) (emphasis added).  The court then reasoned:

> Thus, the statutory scheme includes reliance upon the sale price to
> determine the amount or extend of the feed supplier's lien.  By doing
> so, the statute implicitly recognizes the attachment of the lien to sale
> proceeds.  Any other interpretation would essentially make the lien a
> nullity in that its extent could not be determined until after the
> collateral to which the lien attaches is disposed of—an absurd result at
> best.

Galva Holstein, No. 52-CV-10-356 at *12–13.  This Court finds the Minnesota

District Court's analysis persuasive and adds further support to this Court's

conclusion.

## CONCLUSION

The Court has determined that agricultural liens extend to proceeds.

Additionally, the Court holds that consistent with its decision in In re Shulista, 451

B.R. 867 (Bankr. N.D. Iowa 2011) and In re Big Sky Farms, Inc., No. 12-01711,

Adv. No. 13-09038 (Bankr. N.D. Iowa April 18, 2014), agricultural supply liens

are limited to the 31-day look back period prior to filing a financing statement.

However, the Court finds that there are genuine issues of material fact as to

whether WFS has an agricultural lien on the livestock proceeds.  If the fully

developed record shows that either WFS has been paid in full or that the portion of

the pigs sold had not been fed any of the feed WFS supplied, as the Bank suggests,

then WFS is not entitled to an agricultural lien.

**WHEREFORE**, Peoples Bank's Motion for Partial Summary Judgment is

**GRANTED IN PART AND DENIED IN PART.**

**FURTHER,** Cooperative Credit Company's Motion for Partial Summary

Judgment is **GRANTED IN PART AND DENIED IN PART**.

**FURTHER,** Wantonwan Farm Service's Motion for Partial Summary

Judgment is **GRANTED IN PART AND DENIED IN PART**.

Dated and Entered:  April 18, 2014

_____

**THAD J. COLLINS**
**CHIEF BANKRUPTCY JUDGE**

28