# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 12 |
| GARY L. SCHLEY AND | ) | |
| JULIE M. SCHLEY, | ) | |
| | ) | Bankruptcy No. 10-03252 |
| Debtors. | ) | |
| | ) | |
| GARY L. SCHLEY AND | ) | |
| JULIE M. SCHLEY, | ) | |
| | ) | |
| Plaintiffs, | ) | Adversary No. 10-09255 |
| | ) | |
| v. | ) | |
| | ) | |
| PEOPLES BANK AND | ) | |
| WATONWAN FARM SERVICE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| PEOPLES BANK, | ) | |
| | ) | |
| Cross-Claimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WATONWAN FARM SERVICE, | ) | |
| | ) | |
| Defendant to Cross-Claim. | ) | |

## RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

These cross-motions for summary judgment came before the Court for a telephonic hearing. Nicole Hughes appeared for Peoples Bank ("the Bank"). Matthew Berger appeared for Watonwan Farm Service ("Watonwan"). The Court

heard arguments and gave the parties 14 days to file a statement of stipulated facts. The parties did so. This is a core proceeding under 28 U.S.C. § 157(b)(2)(K).

## STATEMENT OF THE CASE

The Bank holds a perfected security interest in Debtors' livestock proceeds. Watonwan holds a superpriority agricultural supply dealer lien in the same proceeds. The proceeds at issue resulted from the Debtor's sale of about half of the pigs for which Watonwan supplied feed. The proceeds are insufficient to satisfy both creditors' liens. The parties dispute who is entitled to the proceeds. Watonwan argues that it has a superpriority lien for the price of all the feed it supplied. The Bank argues that Watonwan's superpriority lien is limited to the cost of the feed that was consumed by the pigs that were sold and generated the proceeds at issue. After reviewing Iowa's agricultural supply dealer lien statute, the Court agrees with Watonwan: the lien is for the full amount of the feed supplied and attached in full to the animals that consumed the feed.

## BACKGROUND AND STATEMENT OF FACTS

The facts are not in dispute. The parties filed two joint statements of uncontested facts. Those documents are the basis for this statement of facts.

Gary and Julie Schley ("Debtors") ran a feeder-to-finish pig farming operation. This operation had two sites: Lone Rock, which could hold about 3,000

pigs, and Titonka, which could hold about 2,400 pigs. All of the relevant facts in this case took place at the Lone Rock site.

The Bank has a perfected security interest in Debtor's livestock and proceeds. Debtors executed four notes to the Bank between July 2008 and March 2009 totalling $1,360,000. The Bank has a security interest in Debtors' livestock and proceeds securing this claim. The Bank perfected these security interests by filing a financing statement with the Iowa Secretary of State. These financial arrangements started in October 2008 and were completed in March 2009.

In late 2009, Debtors bought 3,061 pigs and housed them all at Lone Rock. These pigs consumed feed that Watonwan supplied and remained at Lone Rock until the last pig was sold. From February 9 to March 11, 2010, Watonwan supplied Debtors with $43,314.54 in feed. On March 11, 2010, Watonwan filed a financing statement that properly established its agricultural supply dealer lien. In May 2010, Debtors sold 1,571 of the 3,061 pigs. The amount of proceeds from that sale is not relevant here, but the number of pigs sold is.

In June 2010, Debtors sold the remaining 1,490 pigs for $209,412.94. Both the Bank and Watonwan claim a perfected security interest in these proceeds.

Debtors filed this adversary on December 17, 2010 to determine lien priority between the Bank and Watonwan in the proceeds from the June 2010 sale. The Bank and Watonwan both moved for summary judgment. The parties agreed on

the disposition of all but $22,094.06 of those sale proceeds. In particular, they agreed that Watonwan had superpriority (because of its perfected agricultural supply dealer lien) in at least $21,224.14. Accordingly, all but $22,094.06 of the funds have been paid out—including $21,224.14 to Watonwan. They dispute which of them has priority on the remaining $22,094.06.

Watonwan argues that its superpriority agricultural supply dealer lien is for the full amount of its claim for feed sold to Debtor between February 9, 2010 and March 11, 2010. The Bank argues, because the proceeds at issue came from 49% of the pigs that consumed the feed, that Watonwan's lien is limited to 49% of the proceeds—the $21,224.14 that has already been paid out. The Bank concludes that it is entitled to the remaining $22,094.06. The parties stipulate that each pig consumed an equal amount of feed. The Bank holds the disputed $22,094.06 in escrow pending resolution of this dispute.

## DISCUSSION

The Bank and Watonwan both moved for summary judgment. Federal Rule of Civil Procedure 56 applies in adversary proceedings. Fed. R. Bankr. P. 7056. Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Here, the parties agree on the

facts. They simply disagree about how the law applies to those facts. Summary judgment is appropriate.

The parties agree that the Bank has a perfected security interest in the proceeds and that Watonwan has a superpriority agricultural supply dealer lien that was ahead of the Bank on at least $21,224.14 of the proceeds. The parties disagree, however, about the total amount of Watonwan's superpriority lien. The Bank believes it was limited to $21,224.14 and is now satisfied. Watonwan believes it extended to the full $43,314.54 in feed that it supplied from February 9 to March 11, 2010 and that it is entitled to the remaining $22,094.06.

This disagreement centers on how to interpret and apply Iowa Code section 570A.3, which is the statutory basis for Watonwan's lien:

> An agricultural supply dealer who provides an agricultural supply to a farmer shall have an agricultural lien as provided in section 554.9102. The agricultural supply dealer is a secured party and the farmer is a debtor for purposes of chapter 554, article 9. The amount of the lien shall be the amount owed to the agricultural supply dealer for the retail cost of the agricultural supply, including labor provided. The lien applies to all of the following:
>
> 1. Crops . . .
>
> 2. Livestock consuming the feed. However, the lien does not apply to that portion of the livestock of a farmer who has paid all amounts due from the farmer for the retail cost, including labor, of the feed.

Iowa Code § 570A.3. The parties agree that Debtors are "farmers"; that Watonwan is an "agricultural supply dealer"; and that the feed that Watonwan supplied is an

5

"agricultural supply;" all as defined in Iowa Code section 570A.1. The parties really only disagree about how to interpret the phrase "[l]ivestock consuming the feed."

The Bank argues that the phrase "[l]ivestock consuming the feed" limits Watonwan's lien to the cost of the feed that was consumed by the pigs that generated the proceeds at issue. In other words, the Bank argues that Watonwan has a lien pro rata on each animal for the amount of feed that that animal consumed. The Bank emphasizes that Watonwan's $43,314.54 claim is for feed that all 3,061 pigs consumed from February 9 to March 11, 2010, but that only 1,490 of those pigs generated the proceeds at issue. The Bank argues that, because these 1,490 pigs did not consume all of the feed that Watonwan supplied, Watonwan's lien on those pigs is not for all the feed that it supplied. The Bank argues that Watonwan's lien is limited to the percentage of the feed that the pigs that generated the proceeds at issue actually consumed. The Bank claims, because only 49% of the pigs that consumed the feed generated the proceeds (1,490 of 3,061), Watonwan had priority in only 49%—$21,224.14—of the proceeds.

Watonwan argues that its superpriority lien extended to the full $43,314.54 in feed that it supplied from February 9 to March 11, 2010. Watonwan argues that the lien amount is determined by the following statutory language: "The amount of the lien shall be the amount owed to the agricultural supply dealer for the retail

6

cost of the agricultural supply, including labor provided." Iowa Code § 570A.3. Watonwan concludes that the amount owed to it "for the retail cost of the feed" is the lien amount. Watonwan argues that the phrase "[l]ivestock consuming the feed" does not limit the amount of the lien, but simply denotes one of the items to which such a lien attaches. That lien attaches to the proceeds from "the livestock consuming the feed," namely, the livestock that resulted in the proceeds at issue. Watonwan concludes that its agricultural supply dealer lien was for the full $43,314.54 in feed it supplied from February 9 to March 11, 2010.

  The Iowa Supreme Court and this Court have interpreted Iowa Code chapter 570A in a number of cases, including an earlier decision in this case. This Court has held that "Iowa Code § 570A.4 limits [an agricultural supply dealer] to a perfected agricultural supply dealer lien for the value of feed it sold in the 31–day period before filing its financing statement." Wells Fargo Bank v. Tama Benton Coop. (In re Shulista), 451 B.R. 867, 882 (Bankr. N.D. Iowa 2011). On a certified question from another case from this Court, the Iowa Supreme Court has held that "section 570A.5(3) creates a superpriority rule independent of the chapter's certified request provisions." Oyens Feed & Supply, Inc. v. Primebank (Oyens I), 808 N.W.2d 186, 195 (Iowa 2011). This Court later held that the Iowa Supreme Court's ruling in Oyens I did not overrule this Court's ruling in Shulista. Farmers Coop. Co. v. Ernst & Young, Inc. (In re Big Sky Farms Inc. ex rel. Ernst & Young,

7

Inc.), 512 B.R. 212, 220 (Bankr. N.D. Iowa 2014). This Court has more recently held that agricultural supply dealer liens continue to livestock proceeds. Watonwan Farm Serv. v. Peoples Bank (In re Schley), 509 B.R. 901, 914 (Bankr. N.D. Iowa 2014). Most recently, the Iowa Supreme Court, on another certified question, held—consistent with this Court's other rulings—that agricultural supply dealers must file new financing statements every 31 days to maintain perfection on the lien for the feed supplied during the previous 31 days and that, when livestock are born in the farmer's facility, the acquisition price is zero. Oyens Feed & Supply, Inc. v. Primebank (Oyens II), 879 N.W.2d 853, 857 (Iowa 2016).

Neither this Court nor the Iowa Supreme Court, however, have specifically addressed the issue in this case. "In the absence of a decision from the Iowa Supreme Court addressing the precise issue before it, this Court must predict how the Iowa Supreme Court would rule if presented with this case." Big Sky Farms, 512 B.R. at 219 (citing JPMorgan Chase Bank, N.A. v. Johnson, 719 F.3d 1010, 1015 (8th Cir. 2013)). "The Iowa Supreme Court has the ultimate authority in interpreting the Iowa Code." Id. The Iowa Supreme Court has set forth the standards for interpreting Iowa statutes:

> When we interpret a statute, we attempt to give effect to the general assembly's intent in enacting the law. Generally, this intent is gleaned from the language of the statute. To ascertain the meaning of the statutory language, we consider the context of the provision at issue and strive to interpret it in a manner consistent with the statute as an integrated whole. Similarly, we interpret a statute consistently with

8

> other statutes concerning the same or a related subject. Finally, statutes are interpreted in a manner to avoid absurd results and to avoid rendering any part of the enactment superfluous.

Bearinger v. Iowa Dep't of Transp., 844 N.W.2d 104, 108 (Iowa 2014) (quoting State v. Comried, 693 N.W.2d 773, 775 (Iowa 2005)) (internal quotation marks omitted). "We assess the statute in its entirety rather than isolated words or phrases to ensure our interpretation is harmonious with the statute as a whole." Ramirez-Trujillo v. Quality Egg, L.L.C., 878 N.W.2d 759, 770 (Iowa 2016), reh'g denied (May 27, 2016) (citing Schadendorf v. Snap-On Tools Corp., 757 N.W.2d 330, 337 (Iowa 2008)). "We may consider an ambiguous statute's legislative history and the applicable preamble or statement of policy." Holiday Inns Franchising, Inc. v. Branstad, 537 N.W.2d 724, 728 (Iowa 1995).

After reviewing Iowa Code section 570A.3, the Court finds that its language is unambiguous. The statute sets out the amount of an agricultural supply dealer lien: "The **amount of the lien** shall be the **amount owed** to the agricultural supply dealer for the retail cost of the agricultural supply, including labor provided." Iowa Code § 570A.3 (emphasis added). The statute then goes on to specify what the lien applies to, including "[l]ivestock consuming the feed."

The Bank's argument—that the lien applies pro rata to each pig for the amount of feed each pig consumed—is not supported by the statutory language. The phrase "[l]ivestock consuming the feed" does not limit the lien amount or

9

address the lien's value in any way.  The language noted above states that the amount of the lien is pegged directly to value of the agricultural supply that the dealer provides.  The Bank interprets the phrase "livestock consuming the feed" as nullifying or overriding the earlier statutory language specifically addressing the value of the lien.  The Bank reads this language in isolation and does not consider the statute as a whole.  This reading violates two canons of statutory interpretation: (1) "presume statutes or rules do not contain superfluous words" and (2) "give effect to every part of the statute, if possible."  Iowa Ins. Inst. v. Core Grp. of Iowa Ass'n for Justice, 867 N.W.2d 58, 75, 83 (Iowa 2015), reh'g denied (Aug. 14, 2015).  The Bank's reading does not comport with these canons.  Watonwan's reading does.  The Court concludes that the Iowa Supreme Court would not give the statute the meaning the Bank urges.

Moreover, even if section 570A.3 were ambiguous, the legislative history behind it—"the objects sought to be accomplished and . . . the evils sought to be remedied"—would compel the Court to reject the Bank's position.  See Holiday Inns Franchising, 537 N.W.2d at 728.  Chapter 570A was enacted "to encourage the credit sale of agricultural supplies by providing the supplier a secured lien in the farmers' crops or livestock." Oyens I, 808 N.W.2d at 189 (citing Thomas E. Salsbery & Gale E. Juhl, Chapter 570A Crop and Livestock Lien Law: A Panacea or Pandora's Box, 34 Drake L. Rev. 361, 363 (1984–85)).  The Iowa Legislature

wanted to encourage credit sales to help farmers with encumbered assets during the 1980s farm debt crisis and "encourage feed sales to livestock producers already burdened with bank debt." Id. at 188, 195.

As noted above, earlier this year, the Iowa Supreme Court again addressed Iowa Code chapter 570A on another certification and looked to legislative intent to determine whether chapter 570A permits an agricultural supply lienholder "to assert superpriority to the full extent of the value of feed purchased" even when there was no acquisition price of the livestock under section 570A.5. Oyens II, 879 N.W.2d at 864. The Iowa Supreme Court noted that the Iowa Legislature passed section 570A.5 "to encourage a fluid feed market without burdening cooperatives and farmers." Id. at 865 (quoting Oyens I, 808 N.W.2d at 194) (internal quotation marks omitted). In particular, the Iowa Supreme Court stated that an interpretation that required farmers and cooperatives to keep "detailed and elaborate record[s] and accounting[s] of every conceivable cost . . . incurred by a farmer in raising a constantly changing group of animals would frustrate the legislature's intent." Id.

Here, the Bank's proposed interpretation would frustrate the intent behind chapter 570A. It would discourage a fluid feed market because of the burden on agricultural supply dealers to document a separate lien on each animal for the amount of feed that that animal consumed. The potential limit agricultural supply dealers would face on their liens if unable to track the amount of feed each animal

11

consumed would discourage them from supplying feed to fully leveraged farmers. To safely establish such a lien would involve burdensome and intensive recordkeeping, feed separation between livestock, and ongoing "detailed and elaborate records" of how much feed each animal consumed. These consequences would be contrary to the legislature's intent.

The Court concludes that the language of Iowa Code section 570A.3 is unambiguous and supports Watonwan's position. The Court further concludes that, even if the language were ambiguous, the legislative intent and the objectives of the statute support Watonwan's position. Section 570A.5 awards Watonwan priority to the extent of the difference between the sale price of the livestock and the acquisition price, or the difference between the livestock's fair market value at the time the lien attaches and the livestock's acquisition price, whichever is greater. Iowa Code § 570A.5. There is no dispute that Watonwan provided $43,314.54 in feed from February 9 to March 11, 2010 and that the 1,490 pigs Debtors sold in June 2010 consumed the feed that Watonwan provided. Watonwan's $43,314.54 superpriority agricultural supply lien applied to in full to these pigs and the proceeds from their sale because Watonwan received no payment on its claim from the earlier sale of 51% of the pigs. Watonwan has received partial payment of $21,224.14. Watonwan is entitled to the remaining $22,094.06 in disputed proceeds that the Bank holds in escrow.

## CONCLUSION

**WHEREFORE**, Watonwan Farm Service's Motion for Summary Judgment is GRANTED.

**FURTHER**, Peoples Bank's Motion for Summary Judgment is DENIED.

Judgment shall enter accordingly.

Dated and Entered:
January 13, 2017

_____
THAD J. COLLINS
CHIEF BANKRUPTCY JUDGE